*In re* NORTON'S ESTATE.

1. WILLS—EXECUTORS AND ADMINISTRATORS—REPAIRS.

Testator devised to his wife the use of part of his property including a farm with buildings, during her life, with directions to the executor to dispose of the real estate after her death. The will empowered the executor to rent the farm. In order to secure a better rental and to improve the barn, which was in need of repairs, the administrator *de bonis non* caused the roof to be raised, the floor to be cemented, and other repairs made at a total cost of slightly over one thous-

and dollars. *Held,* that under 3 Comp. Laws, § 9354, the administrator having obtained the consent of all the heirs but one and the approval of the probate judge, was authorized to make the improvement and pay for the same out of the estate.

2. SAME—ESTATES OF DECEDENTS—CLAIMS—EXPENSES OF ADMINISTRATION.

Purchasers of land from heirs before the estate is closed take subject to the debts and expenses of administration.

3. TRIAL—EVIDENCE.

In reopening a case for the purpose of taking testimony on a single subject, the court may exclude evidence not relating thereto.

Error to Oakland; Smith, J. Submitted January 26, 1912. (Docket No. 78.) Decided March 29, 1912.

The final account of Harvey J. Taylor, administrator *de bonis non* with the will annexed of the estate of John M. Norton, deceased, was presented to the probate court and the account allowed. On appeal of John H. Stevens to the circuit court the order was affirmed. Appellant brings error. Affirmed.

*Patterson & Patterson,* for appellant.

*Perry & Lynch* and *William T. Hosner,* for appellee.

MOORE, C. J. We quote from the brief of counsel for appellant as follows:

" This action is an appeal by John H. Stevens, grantee of one of the heirs at law and legatees of John M. Norton, deceased, from an order of the probate court for the county of Oakland allowing the final account of Harvey J. Taylor, administrator *de bonis non* with will annexed of the estate of John M. Norton, deceased; and the only controversy in the case is with reference to one item in said account, amounting to $1,087.56, paid from the corpus of the principal of the estate for the rebuilding of a barn on the real estate of the late John M. Norton, deceased, which item was credited to the administrator in his final account. * * * The contention of the appellant in this case relates to this item of $1,087.56 for the

rebuilding of the barn. The situation is peculiar, for the reason that appellant, Stevens, transferred his interest in the real estate to John T. Norton in February, 1907, retaining his interest in the personal estate, which, at that time, had been kept intact, as shown by the reports to the probate court. After the sale of his interest in the real estate in February, 1907, and in the summer of 1907, this barn was rebuilt, and the amount was credited in the account filed April 13, 1908. The appellant complains of the finding of law of the circuit judge upon the finding of facts by him, and we urge that the circuit judge erred in his conclusion of law on those facts. The solution of the question involves the construction of the will of John M. Norton with reference to the interest he conveyed to Nancy Norton, his widow, by said will, and also involves the right to make permanent improvements out of the corpus of the estate. We contend that Nancy Norton was no more than a life tenant of this farm, and that she could not use the principal for her support and maintenance, unless the income was insufficient for that purpose. There is no dispute, and can be none, that the income was sufficient, and that none of the principal or corpus of the estate was used for her maintenance and support. The corpus of the estate, to the extent of $1,087.56, was used in the making of a permanent improvement on the farm in the rebuilding of the barn."

The argument then follows to the effect that Mrs. Norton was a life tenant, and that she could not charge the remaindermen for improvements made during the continuance of her estate.

It is apparent that an examination of the provisions of the will and of the character of the improvements made is important. We quote from the will:

"*Second.* I give, devise and bequeath unto my beloved and faithful wife Nancy Norton if she shall survive me the full use of the interest and income of all my estate, both real and personal, except eighty acres of land hereafter mentioned going to my son Grant Norton and his heirs, during the full term of her natural life, and if at any time the interest, use and income thereof shall not be sufficient to maintain her in sickness and in health in as comfortable a manner as she has been accustomed to live, then I give her such further additional sum or sums as

from time to time shall be deemed necessary by my executor or by the probate court to be expended by her for that purpose from the principal sum of my estate. No power is given her however to transfer or encumber the principal sum of the estate except as deemed necessary by my executor or the probate court for her support and maintenance as above set forth."

"*Sixth.* The disposition of my real estate as above provided for in the said section five is not to take place until after the death of my beloved wife Nancy Norton in case she shall survive me."

In a codicil, it is provided as follows:

"*Second.* I have rented my farm to my son Grant C. Norton for the past three years, and I have this day made a lease to him for a longer time, and it is my earnest wish and request that my wife, and the executors of my will, shall extend said lease during the lifetime of my wife, from year to year, and that my son work said farm during the time his mother shall live—and it is my opinion this arrangement will be the best for all parties interested. I do not however make this a condition of my will, as I realize many changes occur, and I do not wish to embarrass my estate by making a binding provision in regard thereto, but I trust and expect that my executors will find it expedient and best to carry out my ideas in this regard as hereinabove mentioned, and I give them full power and authority so to do.

"*Third.* I authorize and empower my executor or the survivor, at the death of my wife, in case she survives me, to sell at either private or public sale, the real estate of which I may die seized, except of course the eighty acres willed to Grant, and to give good and sufficient deed or deeds therefor without the order of the court for that purpose."

It is clear from these provisions that Mr. Norton intended to provided for his wife by giving her the income of his estate and more, if necessary, and that his estate should not be settled until after the death of his wife, and that in the meantime the executor or executors of the estate should have charge thereof, and upon her death it was their duty to sell the real estate.

It was during the lifetime of Mrs. Norton, and after

consulting her, the other heirs, and the judge of probate, and having their approval, that the expenditure was made. Mr. Stevens claims that when he bought out one of the heirs, and before the expenditure was made, that he notified the executor. The latter recalls the notice, but not the time of the notice. It is also the claim of Mr. Stevens that he was not consulted about and did not consent to the expenditures.

The following testimony relates to the need of repairs. Mr. Taylor, the executor, testified:

"The barn was repaired in 1907. Mr. Arft was then the tenant, and was paying $425 a year for the 128 acres, and I think $175 per year for the 80 acres. I was up there in 1907 frequently. The large or main barn on the farm at this time was 100 feet long by 34 feet wide. The sills rested upon the corner stones. There never had been any wall under the barn, but stones around under the posts. It was a very old barn. Its condition in the spring of 1907 was very bad. The roof leaked so much that when I was down there one morning when it had rained the water was running out of the door sill an inch deep. The roof was bad, and the stable where the cows were stabled was at the south end of the barn. There were three or four inches of water, perhaps, that the cows were standing in. The frame of the barn, the sills, had been rotted away; and it became in such condition that the bottom of the barn had spread, and the tenons were pulled out of their beams. The year before Mr. Rundell was on the farm, and was filling it with corn fodder, and they sent for me to come down there; they were afraid the barn was going to collapse. I did not go. I saw it afterwards; and it was braced up with the posts put under the beams, under the cross-beams, in the barn. That was done in the fall of 1906. The tenons were separated out of the center of the posts; and it had been filled until it got so near the beams that there was no room to get under to fill in any higher. It was filled with stones and gravel, and the filling was up to the level of the sills. The cows were standing in the water, and the tenant complained that something would have to be done. The tenant said that he was willing, if we put the barn in better condition, to pay 50 dollars a year more rent. He already had a lease of three years for the place. I saw that the condition of

the barn was very bad, and I went and talked with Mrs. Norton; told her I could not see any way, except to give it a general overhauling in a judicious way, raise it up, and put new sills under it, and a new roof, and in that case I thought the most expedient and best way would be to put new posts, perline plates, and a hip roof, and make some room in the loft. She agreed with me, and was very desirous of having it done.

"*Q.* Now, did you have any talk with the judge of probate on the matter?

"*A.* I did. (Objected to and moved to strike answer out.)

"*The Court:* It goes to good faith.

"*Mr. Lynch:* That is the only purpose for which it is offered. (Exception.) Judge Stockwell was judge of probate, and he asked what about the money; if there was plenty of money on hand to bear the expense. I told him there was, and he said, 'Well, on the general principles, I can't see any impropriety in your going on and fixing the barn.' That is about all there was said about it. I employed a man by the name of Smith as foreman, and he told me he would do the work for $2 a day, and would furnish a good helper at $1.50. He was able to do the carpenter and cement work also. We went on and stripped the barn in the first place and raised it up. There was an old barn that was built as a sheep shed, and they had not kept any sheep on the farm in a long time, and it had not been used to any extent for several years, and the timbers were fairly good in there, and we tore that down and used the old timbers in making up the sills for the ones where the sills had rotted out under the big barn, for the perline posts and plates, etc.; so we had very little timber to buy in repairing the barn. We raised it up and put a cement wall, stone and cement wall, under it. I did not change the size of the barn; but, in regard to the roof, instead of using the original slant roof, we built a hip gambrel roof. The roof was very flat, quarter pitch, and we put on what we call a hip gambrel roof. I think it makes nearly as much again room, with very little more expense. They used the old barn that we tore down, and took the siding off the barn we were repairing, for roof boards for the inside, the cow stable, mangers, milkroom, and all that, as far as it would go, and new shingles. We used every piece of the old barn that could be utilized; and the work was done as

economically as possible.  I think it was a proper and necessary thing to do.  The amount of money expended on the building was $1,087.56, and was paid for material and labor.  We did not put any new floors in the barn.  We put in cement floors for the cows; we built the barn up for dairy purposes, and put a cement floor in the stable. This was what we called the main barn on the farm.  It was a stock barn, and there was a separate barn from this.  I don't think the tenant had room for all the hay and grain, and he had to stack some, and he paid the increased rent."

The tenant and the two sons of John M. Norton testified to substantially the same thing

Testimony was offered on the part of the appellant, including his own testimony, as to the necessity of repairs, and the need of some repairs was clearly shown.  We quote from Mr. Stevens' testimony:

"In my judgment, to obviate the objection they have testified to about leakage, the roof no doubt would need shingling or patching, piecing might have done for some years, and some other repairs that would have made it in good shape.  I could not say what it would cost without some figuring.  The roof boards were good, but just needed shingling."

Cross-examination:

"The roof boards would do for shingling again.  I never made any examination of the building with the idea of figuring how much it would cost to put it in good repair.  I should think patching of the roof would have done for a while.  I do not know how long."

The testimony in the case was all closed.  Later the circuit judge—

"Notified counsel for the parties that he wished some testimony offered to determine whether or not the said Norton farm had been changed from a hay and grain farm to a dairy farm after the death of the said John M. Norton, and that he would reopen the case for the purpose of permitting the parties to introduce testimony upon that subject, and no other."

An effort was made to go outside of the inquiry indi-

cated by the judge, and he declined to permit this. The record shows the following; Mr. Stevens being the witness:

"*Q.* Have you had any considerable experience in building?

"*A.* I have built several and repaired several.

"*Q.* And have you made figures and estimates, or an estimate of what a new roof on the Norton barn would cost, and putting that beam in place?

"*Mr. Hosner:* I object to that as having been gone into.

"*The Court:* I will exclude it.

"*Mr. Patterson:* I want the record to show that I offer proofs to show that for a sum, reasonable sum of $200, that this barn could have been placed in reasonable repair, so that it would have preserved it for a number of years, and that any expenditure outside of that was unwarranted. (Exception for appellant.)"

We think the foregoing statement of facts is sufficient to permit an intelligent consideration of the law of the case. It is apparent that the able argument of counsel, to the effect that the life tenant cannot charge the remainderman with improvements, loses its force, because, in the instant case, the repairs were made by the executor or executors, who, by the express terms of the will, were given control of the estate until after the death of Mrs. Norton.

Section 9354, 3 Comp. Laws, reads in part as follows:

"The executor or administrator shall have a right to the possession of all the real as well as personal estate of the deceased, and may lease the same from year to year, and cancel or modify any existing lease or leases given by the deceased in the same manner that the deceased might have done in his lifetime, and may receive rents, issues, and profits of the real estate until the estate shall have been settled, or until delivered over by order of the probate court to the heirs or devisees; and shall keep in good tenantable repair all houses, buildings, and fences thereon, which are under his control: Provided," etc.

No witness sworn, including the appellant himself, was

willing to say that repairs were not needed. There was a difference as to whether all the repairs that were made were needed. In *Armstrong* v. *Loomis,* 97 Mich. 577 (56 N. W. 938), GRANT, J., speaking for the court, said in part:

"Chapter 229, 2 How. Stat., provides the only methods by which claims against the estates of deceased persons and the expenses of administration, can be allowed and collected. If the personal estate is insufficient for those purposes, then the real estate may be sold, under the decree of the probate court. There is no law in this State for pursuing the real estate in the hands of heirs or distributees. *Showers* v. *Robinson,* 43 Mich. 508 [5 N. W. 988]. Purchasers of land from heirs before the estate is closed take it subject to the debts and expenses of administration. *Hill* v. *Mitchell,* 40 Mich. 389; *Burns* v. *Berry,* 42 Mich. 176 [3 N. W. 924]; *Winegar* v. *Newland,* 44 Mich. 367 [6 N. W. 841]. The heirs and legatees sell and convey subject to the rights of creditors and administrators."

Finally, it is said by counsel (we quote from the brief):

"We also submit that the circuit court erred in the exclusion of testimony competent and material to the issue at the hearing of this case, which is covered by assignments of error 1 to 11, inclusive. And we contend that the errors complained of are sufficient to entitle appellant to a reversal of the judgment."

This testimony, so far as it was important, all related to testimony offered after the court had reopened the case for a single inquiry, and did not bear upon that inquiry. The record discloses the repairs were made in good faith by the executor; that they were reasonably necessary; and that the money was actually expended.

We think the judgment should be affirmed.

STEERE, MCALVAY, BROOKE, BLAIR, STONE, and OSTRANDER, JJ., concurred. BIRD, J., did not sit.